IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **PAIGE E. HAMMER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 15-cv-045-CJP**[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Paige E. Hammer, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Ms. Hammer applied for benefits in November 2011, alleging disability beginning on June 1, 2011. (Tr. 12). After holding an evidentiary hearing, ALJ Kevin R. Martin denied the application for benefits in a decision dated September 13, 2013. (Tr. 12-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 12.

been exhausted and a timely complaint was filed in this Court.

## **Issues Raised by Plaintiff**

Plaintiff raises the following points:

1.  The ALJ failed to properly assess whether plaintiff met Listing 1.02A (Major Dysfunction of a Joint) and/or 14.09A.1 (Inflammatory Arthritis) because plaintiff uses a walker and is therefore unable to ambulate effectively.

2.  The ALJ's credibility analysis was not supported by a legitimate rationale.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C.

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

§423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Hammer was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Martin followed the five-step analytical framework described above. He determined that Ms. Hammer had not been engaged in substantial gainful activity since the alleged onset date. She is insured for DIB through December 31, 2016. He found that plaintiff had severe impairments of lupus, polyarthritis, degenerative disc disease of the cervical spine, restrictive lung disease and hypothyroidism. He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Hammer had the residual functional capacity (RFC) to perform work at the sedentary exertional level with some physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. However, she was able to do other jobs which exist in significant numbers in the national and regional economies.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

1.     **Agency Forms**

Plaintiff was born in 1967.   She was almost 44 years old on the alleged onset date.   (Tr. 200).

Plaintiff said she stopped working on June 1, 2011, because of her condition. (Tr. 213).     She worked as a cashier, an office cleaner, and as a teacher's aide. (Tr. 203).   She had also worked in sales.   (Tr. 230).

In December, 2011, Ms. Hammer stated in a Function Report that she had "pain all over."   When her pain was elevated, she was unable to sleep.   She said she did not do much around the house.   She folded laundry and sometimes helped her husband make dinner.   She alleged difficulties in doing things such as lifting, walking, sitting, standing, talking, hearing, and using her hands.   She used support gloves for hand pain, and was talking with her doctor about getting a walker for use while shopping.   (Tr. 221-229).

In May 2012, plaintiff said she had constant lower back pain and had to use a TENS unit.   She said she had balance issues and dizziness.   (Tr. 268).

2.     **Evidentiary Hearing**

Ms. Hammer was represented by an attorney at the evidentiary hearing on

July 17, 2013.   (Tr. 32).

Plaintiff lived with her husband and seventeen year old daughter.   (Tr. 35).
She was 5'4" tall and weighed 182 pounds.   (Tr. 37).

Cheryl Fuller prescribed a walker for her in February 2013.   The ALJ asked
how often she used it.   She answered, "Well, anytime that I – if I'm going to be out
and engaged – if there's going to be much walking and definitely standing, I have to
have it in [sic] anything."   (Tr. 38).

Plaintiff's last job was at a linens store in Florida.   She was on her feet a lot
in that job and had a lot of pain.   She and her husband moved from Florida to
Illinois in June 2011 because her husband had tried to sell his business in Illinois,
but decided to come back and keep the business.   They lived in Florida for a year.
(Tr. 40-41).   Her husband is a self-employed commercial window washer.   (Tr.
35-36).   Part of the reason that they moved back to Illinois was that plaintiff was
having physical difficulty doing her job.   (Tr. 73).

Ms. Hammer testified that lupus caused her to have flu-like symptoms.   She
had lupus flare-ups almost every day.   She had a lung disorder which caused
shortness of breath.   She always had pain in her back.   (Tr. 43-46).   Her hands
locked up if she used them a lot.   (Tr. 48).   She had sudden bouts of intense pain
in her side because she had a calcified nodule in her lung.   (Tr. 52).

Plaintiff did not get any medical treatment while she lived in Florida except to
have her thyroid pills refilled.   She said she did not  get treatment in Florida
because they were only there for a year, she "didn't have anything established down

there," and she wanted to keep her doctors in Illinois "just because they know me better up here, so I was trying to keep them up here more."   Her doctors in Illinois were a family care practitioner and a rheumatologist.   (Tr. 54).

Ms. Hammer testified that sitting caused her pain.   She had to change positions a lot, and move from sitting to standing.   She could stand for about 10 or 15 minutes.   Even with her walker, she was shaky and had to sit down just after walking from the parking lot that morning.   (Tr. 70).

A vocational expert (VE) also testified.   The ALJ asked him to assume a person who could do work at the sedentary exertional level, limited to no climbing of ladders, ropes or scaffolding, no concentrated exposure to unprotected heights, extreme temperatures or pulmonary irritants, frequent but not constant handling and fingering bilaterally, and limited to simple instructions.   The VE testified that this person could not do plaintiff's past work.   She could, however, do other jobs which exist in significant numbers in the regional and national economies. Examples of such jobs are hand packer, production worker/assembler, and surveillance system monitor.   (Tr. 83-84).[3]

### 3.    Medical Treatment

The earliest medical record is from plaintiff's initial visit to Anna Medical Clinic in October 2011.   She saw Certified Nurse Practitioner Cheryl Fuller there. On the first visit, Ms. Hammer said that she had a positive ANA titer and was seen

---

[3] The ALJ's RFC assessment did not limit plaintiff to simple instructions, but this omission does not prejudice plaintiff.

by a rheumatologist about five years earlier.   She had no further workup after that.
She also had hypothyroidism.   She complained of muscle spasms in her legs and
achiness and fatigue.   Labwork was ordered.   (Tr. 292-293).

In November 2011, CNP Fuller noted that plaintiff's ANA titer was positive.
She prescribed Vimovo (used to treat symptoms of arthritis) and Synthroid, and
ordered repeat labwork.   As she was anemic, an iron supplement was also
prescribed.   (Tr. 291).

Adrian Feinerman, M.D., performed a consultative examination on
December 30, 2011.   Plaintiff told him she had been diagnosed with an
autoimmune problem, lupus, rheumatoid arthritis, and restless leg syndrome.
She complained of sharp, shooting pain in her joints, primarily her knees,
shoulders and hands.   She also complained of fatigue, shortness of breath, and
swelling in her feet.   On exam, there was no anatomic deformity of the cervical,
thoracic or lumbar spine, and the range of motion of the entire spine was full.
Straight leg raising was negative.   There was no anatomic abnormality of the
extremities and no warmth, redness, thickening or swelling of any joint.   All joints
had a full range of motion.   Ambulation was normal without an assistive device.
Muscle strength was normal throughout.   There were no muscle spasms or
atrophy.   She was able to tandem walk, stand on heels and toes, squat and arise,
and arise from a chair.   Dr. Feinerman indicated that she did not need an assistive
device.   Fine and gross manipulation were normal.   He concluded that she was
able to "sit, stand, walk, hear, and speak normally."   In addition, she was able to

"lift, carry and handle objects without difficulty."   (Tr. 307-315).

Plaintiff next saw CNP Fuller in January 2012.   She complained of some stomach upset and epigastric discomfort from her iron supplement.   She wanted a referral to a rheumatologist because she felt fatigued.   CNP Fuller prescribed generic Prilosec, and gave her samples of Vimovo, which she noted contained Nexium.   (Tr. 343).   In February 2012, plaintiff reported that Vimovo had "greatly helped her joint and muscle pain as well as her heartburn and epigastric pain." However, her medical card would not pay for Vimovo, so CNP Fuller prescribed Naproxen.   (Tr. 342).

Plaintiff returned in late February 2012, complaining of neck pain.   On exam, she was "tense and uncomfortable" in the lower cervical and upper thoracic paraspinal muscles.   She was going to see a chiropractor.   (Tr. 341).

CNP Fuller saw plaintiff for a rash under her breast in April 2012.   This was diagnosed as yeast dermatitis.   Plaintiff said that she was doing physical therapy and using a TENS unit, which was helping her fibromyalgia, rheumatoid arthritis and lupus type symptoms.   (Tr. 339).

Plaintiff attended physical therapy for her neck and left shoulder from March to June, 2012.   At discharge, she her shoulder and neck were better, but she still had some "catching" in her neck and numbness down her arm when she moved her shoulder.   (Tr. 390-404).

In May 2012, plaintiff complained to CNP Fuller of tiredness and shortness of breath.   Physical exam was normal.   She was referred to another doctor for her

complaints.   (Tr. 374).

Plaintiff saw Dr. Lucas at Anna Medical Clinic on June 29, 2012.   Dr. Lucas noted that she had a "constellation of not easily explained symptoms."   Plaintiff said that, the prior evening, she had an episode of transitory pain in the front of her neck that "shot through the back of her head."   Physical exam was normal.   Dr. Lucas told her to go ahead with the previously scheduled cardiology and pulmonary testing.   (Tr. 375-376).

The cardiologist first examined plaintiff on June 20, 2012.   Plaintiff complained of weight gain and fatigue.   She denied joint stiffness, joint pain and numbness, tingling or weakness of the extremities.   Physical exam was normal. (Tr. 409-410).   An echocardiogram was normal.   (Tr. 412-413).   An exercise stress test showed appropriate heartrate and blood pressure response to exercise, with no chest pain or arrhythmias.   The test was stopped after 3 minutes and 18 seconds because of leg discomfort and shortness of breath.   (Tr. 415). Pulmonary function testing showed moderate restrictive disease and mild reduction in diffusion capacity.   (Tr. 417-418).

In July 2012, an EMG/nerve conduction study of the upper extremities was normal.   (Tr. 405).   MRI study of the brain was also normal.   (Tr. 364).   An MRI of the cervical spine showed mild central bulging of the C3-4 disc with mild encroachment of the thecal sac, mild to moderate bulging of the C4-5 disc with mild spinal and neural foramina stenosis, moderate bulging of the C5-6 disc with mild to moderate spinal and neural foramina stenosis, and moderate bulging at C6-7 with

mild encroachment upon the thecal sac and central left neural foramina.   (Tr. 363).

In July 2012, plaintiff told CNP Fuller that she was seeing Dr. Beg for her autoimmune condition.[4]   CNP Fuller noted that she had not received any records from Dr. Beg.   (Tr. 377).   In October 2012, plaintiff informed CNP Fuller that Dr. Beg was moving and she was going to find another rheumatologist.   (Tr. 378).

Plaintiff began seeing Dr. Lesley Davila on October 26, 2012.   (Tr. 355). She was referred by Dr. Beg, who was moving out of town.   Ms. Hammer reported that she had symptoms such as joint pain, paresthesias, vision problems, hypersensitivity to light, headache, abdominal pain, shortness of breath, flu-like symptoms and stiffness in the morning.   Her previous workup had shown low titer positive ANA and low titer positive rheumatoid factor.   Physical exam was normal. Her neck was supple and she had no abnormalities of the back or spine.   There was no edema, cyanosis or clubbing of the extremities.   Respiration was normal. Her skin was unremarkable, with no rashes or lesions.   There was no significant warmth, tenderness or synovitis of the small joints of the hands, wrists, elbows, knees or ankles.   Dr. Davila ordered a chest x-ray.   (Tr. 351-355).

Dr. Davila saw plaintiff on January 25, 2013.   She noted that pulmonary testing was consistent with restrictive lung disease.   Physical exam was again normal.   The assessment was undifferentiated connective disease, restrictive lung

---

[4] There are no records from Dr. Beg in the transcript.

disease and polyarthritis.   Dr. Davila prescribed azathioprine.[5]   (Tr. 356-358).

The last office note from Dr. Davila is dated March 1, 2013.   Dr. Davila noted that she had "undifferentiated connective tissue disease favoring lupus." Ms. Hammer told her that the azathioprine had not helped her breathing, but it had helped her joint pain "minimally."   She felt she was having "strange muscle pains" in reaction to the medicine, but she was able to tolerate it.   Physical exam was normal.   Dr. Davila recommended that she continue with azathioprine 50 mg., and the dosage could be increased if her labs were normal.   (Tr. 359-361).

On March 6, 2013, Ms. Hammer saw CNP Fuller for itching on her abdomen. She also requested that a walker with a seat be prescribed for her.   CNP Fuller wrote, "She states that she has tried to go out and do some light shopping with the assistance of her husband and she gets very tired and worn out and she feels like this would be very beneficial for her."   The assessment was skin irritation due to dryness and painful ambulation secondary to lupus and rheumatoid arthritis. CNP Fuller indicated she would prescribe a walker.   (Tr. 381).

### 4.    State Agency Consultant's Assessments

A state agency medical consultant reviewed the medical records and assessed plaintiff's RFC in January 2012.   She concluded that plaintiff was able to do light work with some limitations.   (Tr. 331-338).   A second state agency consultant

---

[5] Azathioprine is an immunosuppressant.   Among other condition, it is "used to treat severe rheumatoid arthritis (a condition in which the body attacks its own joints, causing pain, swelling, and loss of function) when other medications and treatments have not helped." https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682167.html, visited on January 26, 2015.

affirmed that assessment in April 2012, specifically finding that plaintiff's condition did not meet or equal a Listing.   (Tr. 347-349).

## Analysis

Plaintiff's first point is that the ALJ did not adequately discuss whether she met or equaled Listings 1.02A (Major Dysfunction of a Joint) or 14.09A.1 (Inflammatory Arthritis)

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20 C.F.R. §404.1525(d).

"To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment."   *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).   Further, plaintiff bears the burden of proving that she meets or equals all of the criteria of a Listing.   *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The requirements of Listing 1.02A are

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings of appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02A.

The requirements of Listing 14.09A.1 are:

Inflammatory arthritis.   As described in 14.00D6. With:

> A.  Persistent inflammation or persistent deformity of:
> 1.  One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6);

20 C.F.R. § Pt. 404, Subpt. P, App. 1, §14.09A.1.

Plaintiff's argument focuses on the ALJ's finding that she did not have "inability to ambulate effectively."   20 C.F.R. pt. 404, subpt. P, app. 1, §1.00B(2)(b) sets forth a rather cumbersome definition of inability to ambulate effectively. Section 1.00B(2)(b)(1) states that "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."   Section 1.00B(2)(b)(2) goes on to give examples of ineffective ambulation; those examples include "the inability to walk without the use of a walker."   Section 14.00C6 directs that the same definition of inability to ambulate should be used when considering Listing 14.09.

The ALJ determined that Ms. Hammer did not meet either of these Listings because she did not have an inability to ambulate effectively.   Plaintiff argues that she is unable to ambulate effectively because she was prescribed and uses a walker to ambulate.   Doc. 20, p. 8.

The ALJ was skeptical of plaintiff's need for a walker.   He pointed out that the walker was prescribed because plaintiff requested it, and not because of any "medical necessity."   (Tr. 21).   Plaintiff argues that there is no evidence to

contradict plaintiff's need for a walker, and that CNP Fuller's note referenced painful ambulation secondary to lupus and rheumatoid arthritis in the assessment.

Plaintiff's argument fails to appreciate the meaning of the definition of the ineffective ambulation and ignores her own testimony.   Plaintiff testified that she used a walker "Well, anytime that I – if I'm going to be out and engaged – if there's going to be much walking and definitely standing, I have to have it in [sic] anything." (Tr. 38).   She did not testify that she was unable to walk without a walker, and none of the medical records hint at any findings on exam that would suggest that she was unable to walk without a walker.

The real problem with plaintiff's argument is that it is her burden to demonstrate that she meets or equals *all* of the requirements of a Listing.   Listing 1.02A does not even apply to plaintiff and the ALJ was not required to discuss it. 1.02A does not apply to plaintiff because she does not have "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) . . . . of a major peripheral weight-bearing joint."   Rather, she has an autoimmune disorder.   Section 1.00B.1 provides that inflammatory arthritis should be evaluated under 14.09, and not under the Listings in Section 1.00, Musculoskeletal Disorders.   The ALJ's error was not that he failed to adequately discuss 1.02; in fact, he was not required to discuss it at all because it cannot apply to plaintiff.

Similarly, plaintiff cannot show that she meets all of the requirements of Listing 14.09A.1 because she does not have persistent inflammation or persistent deformity of one or more major peripheral weight-bearing joints resulting in the

inability to ambulate.   No healthcare provider ever documented inflammation or deformity of a major weight-bearing joint.   As the ALJ noted in his review of the medical evidence, findings on CNP Fuller's physical exam were good in October 2011 (Tr. 18), Dr. Feinerman reported normal findings in December 2011 (Tr. 19), CNP Fuller again reported unremarkable findings in January 2013 (Tr. 20), and Dr. Davila reported no abnormal physical findings in October 2012 (Tr. 20).   And, the ALJ noted that the record of the visit with CNP Fuller in March 2013 indicates that the walker was prescribed at plaintiff's request and not because of any findings that CNP Fuller made on exam.   (Tr. 21).

Plaintiff does point to any medical evidence to show that she meets all of the requirements of either of the Listing that she cites.   On this record, she could not do so.   Her argument relies solely on her alleged use of a walker.   However, it takes more than that to prevail on this point.   Plaintiff testified, and CNP Fuller's note confirms, that she asked for a walker because she got tired when walking long distances.   That is simply insufficient to come within the purview of either of the Listings at issue.

Ms. Hammer also challenges the credibility determination.   She argues that the ALJ should not have focused on the fact that plaintiff had no treatment while she lived in Florida, and that he cherry-picked the medical evidence to arrive at his conclusion that the medical evidence did not support her claim.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d

431, 435 (7th Cir. 2000).   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.   "[A]n ALJ's credibility findings need not specify which statements were not credible."   *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ did not err in pointing out that Ms. Hammer did not seek any medical treatment while she lived in Florida except for getting a refill of her thyroid medication.   Plaintiff suggests that the ALJ was off-base here because the year that she lived in Florida was before her alleged onset date.   Doc. 20, pp. 9-10.

Ms. Hammer alleges that she became disabled as of June 1, 2011.   That date is around the time she and her husband moved from Florida back to Illinois. She testified that she left her last job in Florida because they moved back to Illinois

and because she was having so much pain while working.   (Tr. 40-41).   Ms. Hammer does not claim that she is disabled due to some event that occurred on June 1, 2011.   Rather, she alleges that she is disabled due to chronic conditions that were diagnosed before her alleged date of disability.   The ALJ asked plaintiff why she did not get medical treatment in Florida; she did not attribute it to lack of insurance or money.   Therefore, cases such as *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), do not come into play here.   It was reasonable for the ALJ to conclude that the fact that Ms. Hammer sought no treatment for these chronic conditions for the year that she lived in Florida cut against she claim that she became unable to work due to pain on June 1, 2011.

As a general proposition, it is true that an ALJ may not cherry-pick the evidence, analyzing only the evidence that supports his conclusion and ignoring the evidence that supports plaintiff's claim.   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   Plaintiff's attempt to demonstrate that the ALJ did so here fails.

Plaintiff points to no medical evidence that was (1) ignored by the ALJ *and* (2) supports her claim.   She cites the findings on the cervical MRI, but those findings were not ignored by the ALJ.   The ALJ also noted that a nerve conduction study of the upper extremities was normal.   See, Tr. 20.   Plaintiff does not attempt to explain how the mild to moderate findings in her cervical spine support her claim of total disability.

Plaintiff also complains, incorrectly, that the ALJ ignored the fact that her pulmonary function study had to be stopped after 3 minutes and 18 seconds

because of leg pain and shortness of breath.   Doc. 20, p. 11.   In fact, it was an exercise stress test and not a pulmonary function study that was stopped.   See, Tr. 415.   Further, the ALJ acknowledged that the test was stopped.   See, Tr. 20.   As the doctor who reported the results of the test did not indicate that this circumstance invalidated the test, it is difficult to understand plaintiff's point here.

Lastly, plaintiff complains that the cardiac workup, pulmonary function testing and nerve conduction study were not relevant to her cervical spine and polyarthralgias, so the ALJ should not have considered the results of those studies. This argument is disingenuous, at best.   Ms. Hammer claimed that she was disabled because of a myriad of symptoms.   The medical records indicate that these studies were done to evaluate complaints she made to health care providers, including shortness of breath and numbness in her upper extremities.   The ALJ reasonably considered the results of these studies.

In addition to the above factors, the ALJ considered the generally benign findings on physical exams, Dr. Feinerman's exam, and the fact that plaintiff had not seen a rheumatologist between 2007 and her alleged date of onset.   Tr. 19-20.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."   *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).   ALJ Martin's analysis is far from patently wrong.   It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.   *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

In sum, none of plaintiff's arguments are persuasive.  Even if reasonable minds could differ as to whether Ms. Hammer is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.  *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Martin committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Paige E. Hammer's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   January 27, 2016.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**